[Cite as *State v. Trammell*, 2013-Ohio-4615.]

## IN THE COURT OF APPEALS OF OHIO
### SECOND APPELLATE DISTRICT
### MONTGOMERY COUNTY

STATE OF OHIO

       Plaintiff-Appellee

v.

RALEIGH TRAMMELL

       Defendant-Appellant

Appellate Case No.    25355

Trial Court Case No.   2010-CR-3364

(Criminal Appeal from
 Common Pleas Court)

. . . . . . . . . . .

## O P I N I O N

Rendered on the 18th day of October, 2013.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by CARLEY J. INGRAM, Atty. Reg. No. 0020084, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

SANDRA J. FINUCANE, Atty. Reg. No. 0067063, 428 Beecher Road, Suite C, Columbus, Ohio 43230
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-Appellant, Raleigh Trammell, appeals from his conviction and sentence on charges of grand theft, forgery, and tampering with government records. Trammell contends that the indictment failed to properly charge him with a fourth-degree felony theft offense or fourth-degree felony forgery offenses. Trammell further contends that his convictions for theft and 25 counts of tampering with government records violate the Double Jeopardy Clause because they are allied offenses of similar import, as are his convictions on the merged forgery counts. Additionally, Trammell contends that his convictions on all charges are not supported by sufficient evidence, and are against the manifest weight of the evidence.

{¶ 2} We conclude that the indictment properly charged Trammell with fourth- degree felony theft and forgery offenses. The indictment informed Trammell that he was being charged with these fourth-degree felony offenses, pursuant to the law then in effect. The amount required to prove the offenses increased after the enactment of H.B. 86, but this did not change Trammell's degree of crime, because the amounts at issue substantially exceeded the amount necessary to establish a fourth-degree felony under either statute.

{¶ 3} We further conclude that the convictions for theft and tampering with government records are not required to be merged. Although they are similar offenses, they were committed at separate times. Finally, we conclude that Trammell's convictions on all charges are supported by sufficient evidence and are not against the manifest weight of the evidence. Accordingly, the judgment of the trial court will be affirmed.

I. Facts and Course of Proceedings

{¶ 4} Between 2005 and 2010, Montgomery County, Ohio, contracted with the Southern Christian Leadership Conference (SCLC) and the Interdenominational Ministerial

Alliance (IMA) to provide a home-delivered meals program serving 10 people per day.[1] Payments for the contracts were funded by the Montgomery County Department of Job and Family Services (MCJFS) and the contracting department of the Montgomery County Auditor's Office. One reason for awarding the contract to the SCLC is that it had unique and specialized abilities to serve hard-to-reach, disadvantaged citizens on the western side of Dayton, Ohio.

{¶ 5} Defendant, Raleigh Trammell, was the point person for the SCLC, and signed the proposals and contracts on its behalf. The first contract took effect on January 1, 2005, and provided $36,950 in anticipated funding, based on a cost of $5.48 for each meal provided during that year. According to the contract, service was limited to individuals 60 years of age and older, who were frail. Persons in long-term care facilities like the Veterans Administration (VA) or nursing homes would not be eligible, because they would be receiving meals through the facility. Under the contract, the SCLC would provide services, and then be reimbursed after invoicing Montgomery County.

{¶ 6} Contracts were subsequently issued in 2006, 2007, 2008, and 2009, for essentially the same amount, and for the same cost per meal. In 2008, a requirement was added, specifying that the persons being served would be at no more than 200% of the federal poverty level. This was included to ensure that needy people were being served, not those with means to purchase their own home-delivered meals.

{¶ 7} When SCLC submitted invoices for payment, SCLC included a detailed roster of the individuals who were served meals, the dates of service, the unit cost, the number of units, the gross amounts, and then a total of those amounts. In addition, the invoices contained a

---

[1] The SCLC and IMA were used interchangeably during the contracting process and at trial. For purposes of convenience, we will refer only to the SCLC.

certification by the provider, verifying that the information in the report was correct and was in accordance with the agreement. Trammell either signed the invoices or directed other managerial employees to sign his name when he was unavailable. The invoices were initially submitted to MCJFS, which reviewed the numbers and signed off on the invoice. After an invoice was entered into the system, a voucher was generated, and the Montgomery County Auditor's office used the documentation to generate payment to SCLC.

{¶ 8} Under the Montgomery County contract, SCLC was required to provide two meals per day to 10 people. The food was prepared at the SCLC offices on West Third Street, which included offices, a kitchen, a soul food restaurant called Chris's Kitchen, and a food pantry. Between 2005 and 2009, SCLC also received between $50,000 and $70,000 in FEMA (Federal Emergency Management Agency) money annually for funding food programs, including congregate meals, delivered meals, and a food pantry. The FEMA money was administered through the United Way of Greater Dayton. Thus, the 20 meals to be served through Montgomery County were only part of the meals being served. Generally, home meals were delivered to about 22 other people in addition to the ten Montgomery County-funded people.

{¶ 9} From the very inception of the Montgomery County contract, SCLC included people who were not entitled to receive meals, or for whom meals were invoiced, but were not delivered. For example, the SCLC claimed to have delivered 240 meals to an individual named Warren Moon between January 1 and April 30, 2005. However, Moon had been admitted to Cross Roads Rehabilitation and Nursing in October 2004. Cross Roads does skilled nursing care, behavior health care, and care for Alzheimer's dementia. Moon was a full-time, in-patient resident from the time of his admission until some point in 2006, and Cross Roads would have provided Moon with three meals per day, plus two snacks, seven days a week. Outside agencies

were not permitted to deliver meals to residents at the nursing home. The total amount of meals claimed to have been delivered to Moon was 424.

{¶ 10}   Kim Penson Gandy testified on Trammell's behalf at the trial. Gandy was responsible for intake and qualifying patients from 2005 to 2010.[2]  Gandy stated that she qualified Moon, and recalled that Moon was living in another location, not a nursing home. Gandy expressed "surprise" during her testimony that Moon was invoiced when he lived at a nursing home. The total amount invoiced for Moon's meals in 2005 was $2,323.52.

{¶ 11}   Similarly, SCLC also submitted invoices for 300 meals that were allegedly delivered to Oscar Davis during 2005. Davis was one of the main deacons at the Central Missionary Baptist Church, where Trammell had been the pastor for many years. Davis was a double amputee and had suffered a stroke that prevented him from using his left arm. Because of his health issues, Davis had been a full-time resident at the VA since 2000. Between 2000 and his death in January 2010, Davis left the VA only to attend church on Sunday and to go home for several hours for a holiday once or twice.

{¶ 12}   Trammell and Davis were long-time friends, and Trammell visited Davis on a number of occasions while Davis lived at the VA. According to the SCLC invoices, the following meals were delivered to Davis, in addition to the meals allegedly delivered in 2005: 550 meals in 2007; 732 meals in 2008; and 612 meals in 2009. This resulted in a total charge to the County of $12,362.88. However, the County withheld payment for 62 meals that were invoiced in January 2010, meaning that the County actually paid $12,023.12.

{¶ 13}   During trial, the State presented testimony from two nursing assistants who had

---

[2]   The State presented evidence that Gandy had represented herself as Trammell's mistress, and that she lived in a home owned by Trammell's church.

extensively cared for Davis at the VA between 2005 and 2010. Both assistants indicated that Davis was supplied three meals per day, plus snacks, by the VA, and that they never saw any outside agencies deliver meals to Davis. In fact, outside agencies were not allowed to contract with or to deliver meals to patients. The only outside food the assistants saw was when Davis returned from church on Sundays with a McDonald's hamburger and a parfait. Perhaps once or twice a month, Davis's granddaughter brought him fast food as well.

{¶ 14} In addition, a clinical dietician from the VA testified that Davis would not have been permitted to receive food from outside agencies, and that she had monitored his weight and food intake monthly. The dietician indicated that it would have been impossible for 2,256 meals to have been delivered to Davis during his occupancy.

{¶ 15} Trammell's explanation for this discrepancy was that meals were delivered to Davis's wife, Elizabeth, who then took Davis dinner at the VA. However, this explanation was discredited by the nurses, who said that Davis's wife visited him generally on Sunday, and perhaps one other day per week. Mrs. Davis, herself, was also ill, and there were extended periods of time, including one period of about a year, when she did not visit her husband. One of the SCLC drivers also stated that he delivered meals to the Davis home for two or three months in 2005, but crossed Davis off the list when he realized that Davis was in a nursing home. Despite this, Davis's name remained on invoices for five years.

{¶ 16} Occasionally, Oscar Davis called down to Chris's Kitchen and asked for a cheese steak sandwich or for catfish. Trammell would tell the cooks to prepare it for Oscar. Trammell then had Glenn Herring, an SCLC employee, take the food to Oscar at the VA. This was not the food that was put in the home-meals delivered program.

{¶ 17} Diana Hargrove was another individual who allegedly received meals in 2005.

At the time, Hargrove was living with her daughter, Keisha Boykin. Hargrove was only 48, below the age range for the program. After Hargrove received 10 or 12 meals, Boykin told the SCLC driver not to bring any more meals, because the meals were basically "slop." She threw away the meals rather than have her mother eat them. For the period of January through April 2005, the County was invoiced for 240 meals, for a total cost of $1,315.20. In total, Montgomery County was invoiced for 424 meals, for a total of $2,323.52. Trammell did not offer any explanation at trial regarding why Hargrove continued to be on the delivery list for the invoices.

{¶ 18} Charlotte Garrett died in May 2004, *before* the first SCLC contract began. However, SCLC allegedly delivered 703 meals to Garrett in 2006, and 180 more in 2007. The total amount invoiced for these meals was $4,998.80. The only explanation offered, by Trammell's witness, Gandy, was that she recalled Garrett's name, and recalled "qualifying" her. Garrett was apparently referred by a neighbor, and Gandy received information over the telephone about Garrett.

{¶ 19} Similarly, the county was invoiced for 608 meals that were allegedly delivered in 2008 to Mary Davis (no apparent relation to Oscar Davis). However, Mary Davis had died in August 2007. The total amount invoiced for these meals was $3,331.84. Davis lived at 17 Trotter Court, and her daughter, Joyce Ann Davis-Willis, testified that her mother had received some meals from the SCLC in 2006. However, due to the poor quality of the meals, Davis-Willis called the SCLC office and asked that the meals be discontinued. After this call, Davis-Willis did not see evidence that any more meals had been delivered.

{¶ 20} The SCLC records indicate that Mary Davis's meals were delivered to 2 Trotter Court, where Davis's sister and niece lived. However, Davis's sister died in May 2007, and

Davis's niece testified that no meals were delivered to 2 Trotter Court in 2008. Again, Gandy expressed "surprise" that meals were delivered after Davis had died.

{¶ 21}   Robert Pennington was also below the age limit for meal delivery, as he was only 49 years of age at the time of trial in 2012. The SCLC invoiced the county for 550 meals that were allegedly delivered to Pennington in 2007, when he lived at Wentworth High Rise, a housing project operated by the Dayton Metropolitan Housing Authority (DMHA). The alleged referral source in SCLC records was Pennington's cousin, Carol, who had previously been listed as an emergency contact on Pennington's DMHA application. Both Pennington and Carol denied contacting SCLC, and said they did not know how SCLC obtained their personal information. Pennington denied receiving any meals from SCLC in 2007, and stated that the only agency to deliver meals was Senior Resource Connection, which provided one meal per day to residents of the High Rise if residents signed up the day before.

{¶ 22}   Likewise, India Rutledge was signed up for meals without her knowledge in 2008. At the time, Rutledge lived in Canaan Manor, and like Pennington, had given a relative's name as an emergency contact on her housing application. Rutledge also included her income and her relative's address and phone numbers on the application. All this information, together with her sister's, Terry Freeman's, name misspelled as "Carry," appeared on the SCLC referral form. Both Rutledge and Freeman denied giving anyone this information, and both denied that Rutledge had ever received any meals from SCLC. Montgomery County was invoiced for 608 meals for Rutledge in 2008, at a cost of $3,331.84.

{¶ 23}   Finally, the SCLC charged Montgomery County for 1,220 meals allegedly delivered in 2008 and 2009 to James "Sonny" Hill, while he was a full-time resident in Lele's Place, a home for the mentally ill. Hill was also a member of Trammell's church, and

according to Gandy, was referred to the meals program by a deacon of the church.

{¶ 24}   Leona Washington, the manager of Lele's Place, testified that she provided three meals per day and snacks to the residents.   Washington indicated that Hill's case manager signed Hill up for the SCLC's home delivery meals program, even though she explained it was not necessary.   Washington also stated that when the meals came, the food was not appetizing and looked old.   As a result, she threw the meals in the trash.   She said the meals came once a month, or sometimes twice a month, and sometimes would not come for months at a time.   She estimated that, at most, six to eight meals came in a month.   After a news report was made about the SCLC home-delivered meals program, the meals began coming pretty consistently.   This occurred in February 2010, when Hill was no longer a resident of the home.

{¶ 25}   The testimony about the quality of the food and the frequency of delivery was varied.   Between 2005 and 2009, the IMA was signed up as a member of The Food Bank, which is a charitable not-for-profit 501(c)(3) emergency food relief agency that acquires and distributes food to non-profit agencies that are providing food relief.[3]   In order to participate, agencies must pay a base fee of $200 per year, and must also pay a service fee based on the poundage of food taken out for the prior period.   From 2005 through 2009, the fee was four cents a pound.   This means, for example, that a member could purchase one thousand pounds of food for $40.   Food purchased at The Food Bank is significantly cheaper than food purchased on the open market.   Members are not permitted to use the food to cook and sell in a restaurant-type operation.

{¶ 26}   When members come to The Food Bank, they are given a "pick list" of what is available in the facility that day.   The list contains a variety of food, broken down by category,

and provides the unit weight, which is either how much the case of food weighs or the weight of a bulk pack of food. Members then fill in how many cases of a particular item they want.

{¶ 27} Until the fall of 2007, SCLC purchased food at The Food Bank. Either Trammell or Gandy went to The Food Bank to order the food. Trammell traveled there in a truck and loaded up the food, or sent a truck back after he ordered the food. When the food arrived at the SCLC offices, Trammell directed where the food went. It was separated among the meals program, the food pantry, and Chris's Kitchen. The State presented evidence that the food purchased from The Food Bank, whether it be perishable food, meat, or canned goods, was used in Chris's Kitchen, and that Chris's Kitchen was Trammell's private, for-profit business. On one occasion, when no food was available for the home meals, an employee cooked a case of chicken wings that she obtained from the Chris's Kitchen freezer. Trammell docked the employee's paycheck $56 for the case of chicken wings.

{¶ 28} In the fall of 2007, IMA did not pay its membership fees for The Food Bank, and the SCLC was no longer able to purchase food there. Instead, SCLC purchased food at more expensive places, like grocery stores. As a result, the quantity of the food declined because of lack of funds.

{¶ 29} The State presented evidence that the food used in the meals program was not of good quality, and that left-over burned or spoiled food from Chris's Kitchen was used to make up the meals for the home-delivered meals program. In addition, the State presented evidence that Trammell directed employees to put the burned or spoiled food in the containers for the meals program. When employees complained, Trammell told them to "shut up," that it wasn't their business. Trial Transcript, Volume VI, p. 1295.

---

[3] IMA, rather than SCLC, is referenced in the main text because the actual membership to The Food Bank was in IMA's name.

**{¶ 30}** Furthermore, the State presented evidence that only one meal per day was provided, with deliveries going out on three days per week, rather than five, and that Trammell decided which days food would be delivered. Trammell submitted evidence indicating that the meals were delivered daily, rather than three times per week, and that the food was of good quality. Some of this latter evidence was impeached by evidence offered by the State on rebuttal.

**{¶ 31}** With respect to Trammell's involvement, the State presented evidence that Trammell kept a close eye on what occurred in the meals program. Specifically, Trammell sometimes went through the list of deliveries with drivers and gave them money for gas, or reimbursed them when they returned with a receipt. Trammell told employees what to do when they came to work each day, and even called with instructions when he was out of town. He walked through the kitchen and asked what was being prepared for the home meals program. Trammell was also present at times when food was being put into containers. In addition, there was a camera in the kitchen area, and a monitor in Trammell's office, where he could observe what happened in the kitchen, at least between 2005 and 2008, when the camera was taken down. If someone were just standing around in the kitchen, Trammell would come in and ask the person to assist.

**{¶ 32}** Trammell signed the contracts for the meals program and either signed the invoices sent to Montgomery County or directed others to sign his name on the invoices. Moreover, Trammell handled all the money for the program. He also intermingled personal and business funds. For example, he deposited checks from the Montgomery County Auditor into bank accounts, including his own personal account, that he controlled.

**{¶ 33}** On February 11, 2010, the Federal Bureau of Investigation conducted search

warrants at the SCLC offices, at Trammell's residence, and at another residence. Subsequently, on February 22, 2010, Montgomery County notified Trammell that it was discontinuing funding for the home-delivered meals program, and that the meals were being transitioned to another provider. An investigator for the Consumer Fraud Division of the Montgomery County Prosecutor's Office also began an investigation in early March 2010.

{¶ 34} Trammell was then indicted on January 12, 2011, on one count of grand theft in the amount of $5,000 or more, a felony of the fourth degree; five counts of forgery, felonies of the fourth degree; 20 counts of forgery, felonies of the fifth degree; and 25 counts of tampering with government records, felonies of the third degree. The grand theft charge was based on the money Trammell received over five years for meals that were promised but not delivered. Five counts of forgery and five counts of tampering with government records pertained to the five yearly contracts that Trammell had signed. The remaining 15 forgery counts and 20 counts of tampering with government records related to the fraudulent invoices that were submitted for payment.

{¶ 35} After a jury trial, Trammell was found guilty on all charges. The trial court merged each forgery count into the tampering with government records count pertaining to the same invoice or contract, and sentenced Trammell to 18 months in prison on each remaining count. Trammell was also sentenced to 18 months in prison for the grand theft charge. All the sentences were imposed concurrently, resulting in a total prison time of 18 months. Trammell appeals from his conviction and sentence. We stayed execution of the sentence pending appeal.

II.   Did the Indictment Properly Charge Trammell

with a Fourth-Degree Felony Theft Offense

or Fourth-Degree Felony Forgery Offenses?

{¶ 36}    Trammell's First Assignment of Error states that:

The Indictment Does Not Properly Charge Appellant With a Fourth Degree Felony Theft Offense or Fourth Degree Felony Forgery Offenses, and His Convictions on Those Counts Violate the Sixth Amendment and Due Process Clause of the United States Constitution Along With Article 1 § 10 of the Ohio Constitution.

{¶ 37}    Under this assignment of error, Trammell contends that he could not have been properly convicted of a fourth-degree felony theft offense, because Count I of the indictment does not specify the degree of the offense, and the value of the property listed in the indictment is $5,000 or more, which constitutes only a fifth-degree felony offense under R.C. 2913.02(B)(2). Trammell makes the same argument regarding the charge alleged in Count V of the indictment, which alleges that Trammell committed a forgery in which the loss to the victim was $5,000 or more.  Although the conviction on this forgery charge was merged for purposes of sentencing with the tampering conviction, Trammell contends that if the tampering conviction is reversed on other grounds, the fourth-degree felony conviction on Count V may not be resurrected on remand.

{¶ 38}    Trammell was indicted on January 12, 2011.  At that time, R.C. 2913.02(B)(2) provided that "If the value of the property or services stolen is five thousand dollars or more and is less than one hundred thousand dollars, a violation of this section is grand theft, a felony of the fourth degree."  The indictment charged Trammell with having deprived Montgomery County of "currency, cash, or its equivalent having a value of Five Thousand Dollars ($5,000) or more * * *."    Accordingly, Trammell was put on notice that he was being charged with a fourth-degree

felony. This is consistent with the case cited by Trammell, which indicates that where an individual is charged with theft, "due process would require that the indictment contain notice of the value of the property involved or the degree of the offense alleged." (Citation omitted.) *State v. Smith*, 121 Ohio St.3d 409, 2009-Ohio-787, 905 N.E.2d 151, ¶ 14.

{¶ 39} Effective September 30, 2011, R.C. 2913.02(B)(2) was amended to state that "If the value of the property or services stolen is seven thousand five hundred dollars or more and is less than one hundred fifty thousand dollars, a violation of this section is grand theft, a felony of the fourth degree * * *." The trial was held after this amendment, which was enacted as part of H.B. 86. The trial transcript indicates that the parties agreed to make changes in the jury instructions that were consistent with H.B. 86. In this regard, the trial court made the following statement:

> We are back on the record in State v. Trammell. * * * I should note that we've had a fairly lengthy discussion off the record about issues involving the charge to the jury.
>
> And I have made certain decisions regarding the charge based upon that discussion. But this is our opportunity to put it on the record that which needs to be put on the record regarding objections to the charge. And then I will make my final decision regarding those issues on the record so that everything is preserved on the record for appellate review down the road, if need be.
>
> So with that in mind, I should note that we did make some changes that are rather cosmetic and also some that are more substantive in terms of, we either have made or are in the process of making changes to reflect House Bill 86 and we all agree that those changes have to be made. And they are being made as we

speak.  Trial Transcript, Volume X, p. 2026.

**{¶ 40}**    After the trial court made these remarks, the defense made no objections to the $7,500 amount listed in the instructions, either then or at the time the instructions were given. *Id*. at p. 2102.  Accordingly, Trammell waived any objections other than plain error.  *See, e.g.*, *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 26. (Citation omitted.) (Failure to object to the form of an indictment before trial waives all but plain error.)

**{¶ 41}**    For the reasons previously mentioned, we find no error, let alone plain error. The indictment properly informed Trammell that he was being charged with fourth-degree felonies in Counts I and V, pursuant to the law then in effect.  The amount required to prove these offenses was increased by H.B. 86, but this did not change Trammell's degree of crime. Specifically, the amount in question was more than $38,000, which substantially exceeded the amount necessary to establish a fourth-degree felony under either statute.  *See State v. Morgan*, 2d Dist. Montgomery No. 25023, 2013-Ohio-122, ¶ 15 (indicating that a felony of the fourth degree involving an amount over $5,000, i.e., $8,657.62, continued to be a felony of the fourth degree under H.B. 86, where the statutory amount for that degree of felony was raised to $7,500.) We also note that the invoices alone pertaining to Oscar Davis exceeded $12,000, which is well above the statutory amount.

**{¶ 42}**    Morever, the fact that a greater amount was required to prove Trammell guilty of the crime benefitted Trammell, as it increased the potential amount that the jury would have to find in order to convict Trammell of the charged offenses.

**{¶ 43}**    Based on the preceding discussion, the First Assignment of Error is overruled.

### III.   Did Trammell's Convictions Violate the Double Jeopardy Clause?

{¶ 44}   Trammell's Second Assignment of Error states as follows:

Appellant's Convictions for Both Theft and 25 Counts of Tampering Violate the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution Along With Article I § 10 of the Ohio Constitution and R.C. § 2941.25; His Convictions on the Merged Forgery Counts Violate These Same Provisions.

{¶ 45}   Under this assignment of error, Trammell contends that his convictions for grand theft and 25 counts of tampering with government records violate the Double Jeopardy Clause of the United States Constitution, Section 10, Article I of the Ohio Constitution, and R.C. 2941.25, because these crimes are allied offenses of similar import and were alleged to have been committed with the same animus.

{¶ 46}   With respect to allied offenses, R.C. 2941.25 provides that:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 47}   In *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, the Supreme Court of Ohio held that "[w]hen determining whether two offenses are allied offenses

of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." *Id.* at syllabus [overruling *State v. Rance*, 85 Ohio St.3d 632, 710 N.E.2d 699 (1999)]. In *Johnson*, the Supreme Court of Ohio also outlined a framework for evaluating merger issues.

**{¶ 48}** The first consideration "is whether it is possible to commit one offense *and* commit the other with the same conduct * * *." (Citation omitted. Emphasis in original.) *Johnson* at ¶ 48. "If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import." *Id.*

**{¶ 49}** If the first prong is satisfied, the next consideration is "whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.' " *Id.* at ¶ 49, quoting *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, ¶ 50 (Lanzinger, J., dissenting). However, "if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge." *Johnson* at ¶ 51. The defendant also has the burden of proving entitlement to merger. *State v. Forney*, 2d Dist. Champaign No. 2012-CA-36, 2013-Ohio-3458, ¶ 10. (Citation omitted.)

**{¶ 50}** In the case before us, Trammell was charged with having committed grand theft, in violation of R.C. 2913.02(A)(3), which provides that:

No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

* * *

(3) By deception * * *.

**{¶ 51}**   Trammell was also charged with the offense of tampering with government records in connection with the five contracts that he signed and the 20 invoices he sent to Montgomery County to secure payment for meals that were allegedly provided to elderly and frail citizens.   In this regard, R.C. 2913.42(A)(1) provides that:

No person, knowing the person has no privilege to do so, and with purpose

to defraud or knowing that the person is facilitating a fraud, shall do any of the

following:

(1)   Falsify, destroy, remove, conceal, alter, deface, or mutilate any

writing, computer software, data, or record * * *.

**{¶ 52}**   In its brief, the State assumes for purposes of argument that it is possible to commit both offenses with the same conduct.   The State then argues that the crimes were committed with a separate animus, because the act of falsifying each of the five contracts was a predicate for putting Trammell in a position to commit the theft.

**{¶ 53}**   Furthermore, the State also argues that the act of submitting false invoices was a crime that was necessary to, but separate from, the theft.   According to the State, the offense of tampering with government records was complete when Trammell submitted the false invoices. However, the theft offense did not occur until Trammell cashed the government's checks and kept the money.

**{¶ 54}**   As support for its argument, the State relies on *State v. Leach*, 195 Ohio App.3d 433, 2011-Ohio-4745, 960 N.E.2d 531 (5th Dist.)   In *Leach*, the defendant was convicted of "theft by deception of a firearm from a federally licensed firearms dealer in violation of R.C. 2913.02(A)(3)," "one count of theft beyond the scope of consent of merchandise worth more than

$5,000 but less than $100,000 in violation of 2913(A)(2), and one count of tampering with records resulting in a loss of more than $5,000 but less than $100,000 in violation of 2913.42(A)(1)." *Id*. at ¶ 8 and 17.

{¶ 55} On appeal, the defendant argued that the trial court erred in failing to merge his convictions for theft and tampering with evidence. *Id.* at ¶ 35. These convictions related to the defendant's acts in manipulating sales records to show that sales of concealed-carry classes had been voided. *Id.* at ¶ 6 and 56. After voiding the sales, the defendant credited the voided amounts to a layaway account for a rifle purchased in his father's name. *Id*. at ¶ 6. When the final deposit from the voided transactions was made to the layaway account, the defendant removed the rifle from the store and gave it to his father. *Id*.

{¶ 56} After outlining the applicable standards from *Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, the Fifth District Court of Appeals observed that "[w]ith regard to the first prong of the analysis under *Johnson*, it is undisputed that it is possible for both counts to be committed with the same act." *Leach* at ¶ 55. We agree with this observation.

{¶ 57} However, the crimes in *Leach* were not committed with the same conduct. In *Leach*, the Fifth District concluded that the defendant had committed the crimes separately because the tampering occurred when the defendant voided the sales records, and the theft occurred when the defendant physically removed the firearm from the premises. *Leach*, 195 Ohio App.3d 433, 2011-Ohio-4745, 960 N.E.2d 531, at ¶ 55-58. The Fifth District Court of Appeals reached essentially the same conclusion in *State v. Atkins*, 5th Dist. Fairfield No. 12-CA-39, 2013-Ohio-2326, by noting that the offense of tampering with records was complete when the defendant entered false information on an application for child care cash assistance benefits, while the theft was not consummated until the defendant obtained control over the

benefits.  *Id.* at ¶ 26.

**{¶ 58}**  In a related context, the Fourth District Court of Appeals has considered whether forgery and theft are allied offenses of similar import after *Johnson*.  The Fourth District Court of Appeals concluded that this was an issue of first impression.  *State v. Taylor*, 4th Dist. Hocking No. 12CA10, 2013-Ohio-472, ¶ 11.

**{¶ 59}**  After outlining the standards taken from *Johnson*, the Fourth District Court of Appeals stated that:

> R.C. 2913.31 is Ohio's general forgery statute and this is the label given to the offense with which appellant was charged under Count III. However, the specific charge against him is not actually forging a signature under subsection (A)(1).  Rather, the subsection charged in the indictment alleged that appellant uttered a forged check (subsection (A)(3)).  This is an important distinction.  As noted above, to "utter" is statutorily defined, inter alia, as being to use, transfer or put into circulation.  This suggests, although the record is unclear on the point, that appellant committed the crime when he presented the check at the bank and received, in return, three hundred dollars of the victim's money.  The passing (or "uttering") of the check is the forgery offense and his receipt of money was the theft offense.  However, these two offenses occurred simultaneously, as a result of the same conduct, and arose from the same animus.  Therefore, under *Johnson* we agree with appellant that under the facts present in this case these offenses are allied offenses of similar import.  Consequently, appellant may only be convicted and sentenced on one offense.  (Footnote omitted.)  *Id.* at ¶ 13.

**{¶ 60}**  Nonetheless, in a footnote, the court also made the following observations:

We note, however, that a slightly different set of facts could have arguably changed the outcome of our analysis. For instance, if appellant was charged with an (A)(1) violation, and the forgery occurred several days before he cashed the check, it may not constitute the same conduct. Similarly, if appellant was charged with (A)(1), but someone else cashed the check and then returned the money to appellant, the result of our analysis may have been different as well. *Taylor* at ¶ 13, fn. 1.

**{¶ 61}** We reached a similar conclusion in *State v. Brown*, 2d Dist. Montgomery Nos. 25342, 25343, 2013-Ohio-2756. We noted that "[u]nder the facts of this case, the offenses of receiving stolen property and forgery related to check number 5769 were clearly committed separately, notwithstanding the fact that a single check was involved. Although there may be circumstances in which one could simultaneously commit these offenses, Brown committed the acts of receiving and uttering the instrument separately, on different days and in different places. Thus, they were not allied offenses of similar import." *Id*. at ¶ 22.

**{¶ 62}** In the case before us, Trammell's conduct in signing the contracts and invoices was significantly separated in time from his conduct in receiving and cashing the checks from Montgomery County. Accordingly, the charges of tampering with government records and theft are not allied offenses of similar import under the circumstances of this case, and the trial court did not err in refusing to merge the offenses for purposes of sentencing.

**{¶ 63}** Trammell's Second Assignment of Error is overruled.

IV. Is There Insufficient Evidence to Support the Charges,
and Are the Convictions Against the Manifest Weight of the Evidence?

**{¶ 64}** Trammell's Third Assignment of Error states that:

There is Insufficient Evidence to Support Appellant's Convictions for Tampering, Forgery and Theft in Violation of the Due Process Clause of the United States Constitution and Article I, § 10 of the Ohio Constitution, and the Convictions Are Against the Manifest Weight of the Evidence.

**{¶ 65}** Under this assignment of error, Trammell makes various arguments pertaining to each alleged crime. After reviewing the applicable standards, we will separately address each argument.

### A. Insufficiency of the Evidence

**{¶ 66}** "A sufficiency-of-the-evidence argument challenges whether the state has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law." *State v. Cherry*, 171 Ohio App.3d 375, 2007-Ohio-2133, 870 N.E.2d 808, ¶ 9 (2d Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "The proper test to apply to the inquiry is the one set forth in paragraph two of the syllabus of *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492: 'An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *Cherry* at ¶ 9.

**{¶ 67}** Initially, Trammell contends that he did not tamper with the contracts because

he merely signed his name to the contracts and did not place any information in the contracts, false or otherwise. Trammell also maintains that he did not commit forgery with respect to the contracts, because signing a contract does not constitute forgery, even if a party fails to abide by the contractual terms. Finally, Trammell argues that he is not guilty of either tampering or forgery with respect to the invoices, because he did not alter them, nor did he pass off false versions of the invoices as genuine.

{¶ 68} In responding, the State first contends that Trammell waived these arguments by failing to include them when he moved for acquittal at trial. In addition, the State contends that no error occurred, because the tampering and felony convictions arose from false invoices that Trammell certified as true, and from false information he included in contracts he had no intention of honoring.

{¶ 69} Our review of the record indicates that Trammell raised arguments about these issues in a motion for acquittal filed within fourteen days after trial, as is permitted by Crim.R. 29(C). Accordingly, Trammell did not waive the issues raised in the Third Assignment of Error.

{¶ 70} As was noted earlier, Trammell was charged with tampering with records pursuant to R.C. 2913.42(A)(1), which provides that:

No person, knowing the person has no privilege to do so, and with purpose to defraud or knowing that the person is facilitating a fraud, shall do any of the following:

(1) Falsify, destroy, remove, conceal, alter, deface, or mutilate any writing, computer software, data, or record * * *.

{¶ 71} Ordinarily, this crime is a misdemeanor of the first degree, but R.C.

2913.42(B)(4) elevates the degree to a third-degree felony "[i]f the writing, data, computer software, or record is kept by or belongs to a local, state, or federal governmental entity * * * ."

{¶ 72}    After reviewing the record, we find no merit to Trammell's argument about the invoices. The State presented testimony indicating that Trammell signed invoices containing false information. Trammell's managers also signed his name to invoices, at his direction. Furthermore, Trammell certified that the invoices were accurate, but they were not, according to the State's evidence. This was sufficient for prosecution under the statute pertaining to tampering with records. *See State v. Rivarde*, 197 Ohio App.3d 99, 2011-Ohio-5354, 966 N.E.2d 301, ¶ 26 (12th Dist.) (concluding that while the defendant could have been convicted under three different statutes, including the statute prohibiting tampering with records, due to falsifying her application for food stamps and Medicaid benefits, there was no error in trying her only for tampering with records).

{¶ 73}    Similarly, in *State v. Brumback*, 109 Ohio App.3d 65, 81, 671 N.E.2d 1064 (9th Dist.1996), the Ninth District Court of Appeals affirmed the defendant's conviction for tampering with records. The conviction was based on unsubstantiated mileage requests that the defendant had submitted. *Id.* at 72. In particular, the court noted that "[a]n invoice is false if it represents something that did not happen." *Id.* at 81. *See, also*, *State v. Brunning,* 134 Ohio St.3d 438, 2012-Ohio-5752, 983 N.E.2d 316, ¶ 30 (holding that a convicted sex offender violated R.C. 2913.42(A) by furnishing false information on a form submitted to police to verify his address).

{¶ 74}    Trammell also argues that the invoices and contracts were not being kept by, nor did they belong to a government entity when Trammell signed them. A similar argument was rejected with respect to a bill submitted to a city engineer by a contractor in

*State v. Ciha*, 9th Dist. Lorain No. 92CA005507, 1993 WL 525877 (Dec. 8, 1993). In that case, the court based its decision on the broad policy of interpreting government records, as well as the care taken by the city to ensure that "bills reflect the correct situation before they are paid." *Id.* at * 4. The same observations apply here, considering that the invoices were checked and double-checked before payment was made, and that the County retained payment records for five years.

{¶ 75} The contracts between the County and SCLC represent a somewhat different situation, because they do not contain facially false statements. The State's theory in this regard, however, is that Trammell entered into these contracts fraudulently from the very beginning, because he never intended to comply with the contract. There is evidence in the record to support this conclusion. In particular, Montgomery County was invoiced for meals for Warren Moon and Diana Hargrove at the very inception of the program in 2005, when those individuals were not qualified for the program, and did not receive the meals. The County was also invoiced for 300 meals in 2005 allegedly delivered to Trammell's personal friend, Oscar Davis, who had been a full-time resident at the VA since 2000. Accordingly, the convictions for tampering with government records are supported by sufficient evidence.

{¶ 76} Trammell was also charged with a violation of R.C. 2913.31(A)(2), which provides that:

> No person, with purpose to defraud, or knowing that the person is facilitating a fraud, shall do any of the following:
>
> (2) Forge any writing so that it purports to be genuine when it actually is spurious, or to be the act of another who did not authorize that act, or to have been executed at a time or place or with terms different from what in fact was the case,

or to be a copy of an original when no such original existed * * *.

{¶ 77}    R.C. 2913.01(G) states that " '[f]orge' means to fabricate or create, in whole or in part and by any means, any spurious writing or to make, execute, alter, complete, reproduce, or otherwise purport to authenticate any writing, when the writing in fact is not authenticated by that conduct."   The term spurious is not defined by statue.   However, where statutory terms are not defined, courts will use a word's " 'common, everyday meaning.' "  *Am. Fiber Sys., Inc. v. Levin*, 125 Ohio St.3d 374, 2010-Ohio-1468, 928 N.E.2d 695, ¶ 24, quoting *State v. Dorso*, 4 Ohio St.3d 60, 62, 446 N.E.2d 449 (1983).

{¶ 78}    " 'Spurious' is defined * * * as 'outwardly similar or corresponding to something without having its genuine qualities[.]' "  *State v. Leatherwood*, 9th Dist. Lorain No. 93CA005744, 1994 WL 316482, * 2 (July 6, 1994), quoting Webster's Ninth New Collegiate Dictionary 1143 (1984).

{¶ 79}    Again, the theory regarding the contracts is that Trammell signed the contracts and purported that they were genuine, when he never intended to comply with the terms. Similar actions have been held sufficient to support forgery charges.   In *State v. Bergsmark*, 6th Dist. Lucas No. L-03-1137, 2004-Ohio-5753, the defendant was convicted of having violated R.C. 2913.31(A)(2), based on a lease agreement that he had directed his employee to prepare. The lease was for an apartment that was not habitable and for which rent was never paid.   The purpose of the lease was to deceive the city so that a city employee could show residence in the city and keep his job.   *Id.* at ¶ 26-29.   Accordingly, the forgery convictions for the five contracts are supported by sufficient evidence.

{¶ 80}    The State also presented sufficient evidence that the invoices contained false information.   In a similar context, the Eleventh District Court of Appeals rejected a defendant's

argument that his forgery convictions were not supported by sufficient evidence. See *State v. Fiorenzo*, 108 Ohio App.3d 500, 671 N.E.2d 287 (11th Dist.1996). The defendant in *Fiorenzo,* a county engineer, approved statements from contractors seeking payment for work that either had not been done by the contractors or had been performed by county employees. *Id*. at 503. The engineer also submitted and signed cost breakdowns listing items that, again, were not done by the contractors or had been performed by county employees. *Id.* at 504. The Eleventh District Court of Appeals concluded that the forgery convictions were supported by sufficient evidence. Among other things, the court observed that "[a] review of the testimony presented at trial reveals that appellant was an active participant in defrauding the taxpayers of Trumbull County and not, as appellant presents to this court, a stooge who blindly signed documents from contractors submitting bills to his office." *Id.* at 512.

{¶ 81} We also concluded, in a similar situation, that "[f]orgery was committed when [the defendant] delivered to the insurance company a prescription list purportedly generated by a hospital computer from hospital records and purporting to be a record of drugs that were dispensed as prescribed by Dr. Manis and the amount paid for each drug, knowing the list to be false." *State v. Shanely*, 2d Dist. Miami No. 92-CA-68, 1994 WL 37374, * 3 (Feb. 9, 1994).

{¶ 82} In support of his argument that forgery charges are inapplicable, Trammell relies on two cases. The first case is *State v. Linn*, 9th Dist. Summit No. 19095, 2000 WL 202096 (Feb. 16, 2000). In *Linn*, the Ninth District Court of Appeals affirmed a defendant's conviction for theft, but reversed her conviction for forgery. In this regard, the court commented that:

> The state did not establish sufficient evidence of the charges of forgery as they failed to show that the checks were forged as defined in R.C. 2913.01(G). However, the state did provide sufficient evidence of the two charges of theft.

The state demonstrated a plan or scheme to steal the money from the banks by showing a continuing course of conduct between the events that transpired in Texas and those that transpired in Ohio. As shown through the evidence presented at trial, Defendant wrote bad checks to her son who then deposited the checks into his bank account. Defendant received notification of the insufficient funds and her account was closed. Defendant then received bad checks from her son written on the same account into which he had previously deposited her bad checks. Defendant withdrew funds from her account before the checks from her son had cleared. These actions evince an intent to deprive the Ohio Savings Bank and the Second National Bank of Warren of funds.

Upon a review of the evidence in a light most favorable to the prosecution, we find that the prosecution presented sufficient evidence of theft, but failed to demonstrate the elements necessary to show forgery. *Id.* at * 2.

{¶ 83} In contrast to the case before us, *Linn* did not involve a violation of R.C. 2913.31(A)(2). Instead, the alleged violation was of R.C. 2913.31(A)(3), which requires that a person " '[u]tter, or possess with purpose to utter, any writing that the person knows to have been forged.' " *Id*. at * 1. " 'Utter' means to issue, publish, transfer, use, put or send into circulation, deliver, or display." R.C. 2913.01(H). R.C. 2913.31(A)(3) also does not include a reference to "spurious" documents. Thus, *Linn* involved different violations and different proof.

{¶ 84} The second case that *Trammell* cites is *State v. Brunsman*, 10th Dist. Franklin No. 86AP-131, 1986 WL 14479 (Dec. 18, 1986). In *Brunsman*, the defendant was convicted of three counts of forgery, based on his submission of receipts to his insurance company in

connection with a claim. *Id*. at * 1. One receipt (the Berman receipt), had been altered from the original, and the other two (the Schottenstein receipts), had not been altered, although a writing on the back of these receipts had not been copied and provided to the insurance company. *Id*. at * 1-2. On appeal, the defendant argued, among other things, that the convictions were not supported by sufficient evidence. The court of appeals noted, without further discussion, that:

> R.C. 2913.01(6) [sic] defines "forge" and comprehends all forms of falsification purporting to authenticate a writing. While the evidence regarding the Berman count may be sufficient enough to establish such an offense, the documents regarding the Schottenstein documents are not established as forgeries by definition. *Brunsman* at * 2.

{¶ 85} To the extent that *Brunsman* involved submission of a false or altered document, it is consistent with the decisions we have cited. Furthermore, the court's decision contains only a blanket reference to "authenticating a writing," without any discussion or explanation. In the case before us, there was no suggestion that Trammell "authenticated" or attempted to authenticate a writing. The claim, instead, was that he created a spurious writing (the contract) in order to engage in fraudulent conduct. Therefore, *Brunsman* is of little assistance.

{¶ 86} Based on the preceding discussion, we conclude that " 'after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements' " of theft, tampering with government records, and forgery proven beyond a reasonable doubt. *Cherry*, 171 Ohio App.3d 375, 2007-Ohio-2133, 870 N.E.2d 808, at ¶ 9, quoting *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

## B.   Manifest Weight

**{¶ 87}**   Trammell's final argument is that State failed to meet its burden of proof on all three crimes.   This contention is based on the State's alleged failure to show either that Trammell had knowledge that the services described in the invoices were not performed, or that Trammell intended to defraud Montgomery County. Trammell captions this argument as being based on sufficiency, but his discussion is based on a manifest weight analysis.   Nonetheless, the argument fails on either ground.

**{¶ 88}**   We have previously outlined the standards for deciding whether a judgment is supported by sufficient evidence.   In contrast, "[a]   weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive."   (Citation omitted.)   *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12.

**{¶ 89}**   "When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' "   *State v. Hill*, 2d Dist. Montgomery No. 25172, 2013-Ohio-717, ¶ 8, quoting *Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541.   "A judgment should be reversed as being against the manifest weight of the evidence 'only in the exceptional case in which the evidence weighs heavily against the conviction.' "   *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 90}** In his discussion of this issue, Trammell essentially contends, as he did at trial, that he was a very busy person and delegated the running of the meals operation to others. According to Trammell, there is no evidence that he acted with purpose; instead, at worst, he may have been inattentive to the invoices and may have exercised negligent supervision.

**{¶ 91}** The crimes involved in the case before us require that Trammell have "purpose to defraud" [R.C. 2913.31(A)(2) and R.C. 2913.42(A)(1)], that he have "purpose to deprive the owner of property or services," and that he knowingly obtained control over the property or services by deception. R.C. 2913.02(A)(3). The trial court charged the jury with respect to Trammell's liability both as a principal and as an aider/abettor.

**{¶ 92}** "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A).

**{¶ 93}** " 'It is a fundamental principle that a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts.' " *State v. Lott*, 51 Ohio St.3d 160, 168, 555 N.E.2d 293 (1990), quoting *State v. Johnson*, 56 Ohio St.2d 35, 39, 381 N.E.2d 637 (1978). (Other citation omitted.) " 'The intent of an accused person dwells in his mind. Not being ascertainable by the exercise of any or all of the senses, it can never be proved by the direct testimony of a third person, and it need not be. It must be gathered from the surrounding facts and circumstances under proper instructions from the court.' " *Johnson* at 38, quoting *State v. Huffman,* 131 Ohio St. 27, 1 N.E.2d 313 (1936), paragraph four of the syllabus.

**{¶ 94}** The Ohio Supreme Court has also remarked on the probative effect of circumstantial evidence, as follows:

Circumstantial evidence and direct evidence inherently possess the same probative value. In some instances certain facts can only be established by circumstantial evidence. Hence, we can discern no reason to continue the requirement that circumstantial evidence must be irreconcilable with any reasonable theory of an accused's innocence in order to support a finding of guilt. We agree with those courts that have held that an additional instruction on the sufficiency of circumstantial evidence invites confusion and is unwarranted. Since circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt. Nothing more should be required of a factfinder. (Citations omitted.) *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, at 272, superseded on other grounds by constitutional amendment, as stated in *State v. Smith*, 80 Ohio St.3d 89, 103, n. 4, 684 N.E.2d 668 (1997).

**{¶ 95}** After reviewing the record, we cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice, nor can we find that this is the exceptional case in which the conviction must be reversed. The State could not have possibly provided direct evidence of Trammell's intent, since Trammell did not testify. Therefore, the State was required to rely on circumstantial evidence, which is equal in probative value to direct evidence.

**{¶ 96}** In this regard, the State submitted testimony indicating that Trammell was intimately involved with the meals program, even if he delegated certain duties to others. As was noted earlier, the State presented evidence that Trammell kept a close eye on what occurred in the program. Specifically, Trammell sometimes went through the list of deliveries with

drivers and gave them money for gas, or reimbursed them when they returned with a receipt. Trammell told employees what to do when they came to work each day, and even called with instructions when he was out of town. He walked through the kitchen and asked what was being prepared for the home meals program. According to the testimony of one of his own witnesses, Trammell took the meals program very seriously and communicated that to her. He wanted to know what was being prepared, and was present when food was being put into containers. He also gave her (Linette Swint) the route list.

{¶ 97} In addition, there was a camera in the kitchen area, and a monitor in Trammell's office, where he could observe what happened in the kitchen, at least between 2005 and 2008, when the camera was taken down. If someone were just standing around in the kitchen, Trammell would come in and ask the person to assist.

{¶ 98} The evidence further indicated that Trammell signed the proposals and contracts and would have known of the contract requirements. He ordered food from The Food Bank and directed where it should be allocated, including to his own restaurant, which was a violation of The Food Bank rules. When Trammell was told by an employee that an individual on the route list was dead and should be taken off the list, Trammel told the employee, "Don't you have some work to do" – implying that she should mind her own business. Trial Transcript, Volume VI, p. 1306.

{¶ 99} Additionally, the State presented evidence from which the jury could conclude that Trammell knew from the beginning, in 2005, that his friend, Oscar Davis, was in the VA and was not eligible for meal delivery. The evidence also indicated that no meals were ever delivered to the VA for Davis. Yet, the SCLC, through Trammell, continued to bill Montgomery County between 2005 and 2010 for meals that were never delivered. This is not

something that Trammell could have overlooked, or of which he could have been ignorant.

{¶ 100}     Finally, Trammell was the only person to handle the money received from Montgomery County, and he deposited money in his own bank account.   Although Trammell presented some minimal testimony that he used money from his personal accounts for food, he did not submit any records or testimony detailing how much was spent to offset the thousands of dollars that were deposited into his personal account.  *See* State's Exhibits 120, 121, and 122.

{¶ 101}     Under the circumstances, the jury could have found that Trammell had purpose to defraud Montgomery County, and that he knowingly obtained or exerted control over property belonging to Montgomery County by deception.   We have carefully reviewed the record, and while Trammell presented some evidence disputing the evidence from prosecution witnesses, the jury "did not lose its way simply because it chose to believe the state's witnesses rather than Defendant's witnesses, which it was entitled to do."  *State v. Pounds*,  2d Dist. Montgomery No. 21257, 2006-Ohio-3040, ¶ 40.

{¶ 102}     Based on the preceding discussion, the Third Assignment of Error is overruled.


V.   Conclusion

{¶ 103}     All of Trammell's assignments of error having been overruled, the judgment of the trial court is affirmed.

FAIN, P.J., concurs.

FROELICH, J., concurring:

{¶ 104}     Although I concur with the majority, I would find that there was

insufficient evidence of forgery. However, the trial court merged those courts into the tampering and sentenced (i.e. convicted) the defendant on the tampering. Therefore, I agree that the judgment of the trial court should be affirmed.

. . . . . . . . . .

Copies mailed to:

Mathias H. Heck
Carley J. Ingram
Sandra J. Finucane
Hon. Michael Tucker