DECISION AND JUDGMENT ENTRY
{¶ 1} Edwin Bergsmark appeals his convictions for passing bad checks and forgery from the Lucas County Court of Common Pleas. Because we conclude that the convictions were supported by the sufficiency and manifest weight of the evidence, we affirm.
 Facts {¶ 2} Bergsmark was indicted August 8, 2002 on 12 counts of passing bad checks, violations of R.C. 2913.11. Ten counts were felonies of the fifth degree because the amount of the dishonored check was between $500 and $5,000. However, two counts were felonies of the fourth degree because the amount of the dishonored check was between $5,000 and $10,000. He was also indicted on the fifth degree felony of forgery, a violation of R.C. 2913.31 and the third degree felony of bribery. After a five day trial to the bench, Bergsmark was found guilty of all counts with the exception of bribery. He was sentenced to five years of community control, sixty days of incarceration at a community based correctional facility, and ordered to pay $38,667 in restitution as well as the costs and fees associated with his case. He now appeals.
 Bergsmark's Assignments of Error {¶ 3} "Mr. Bergsmark's conviction is not supported by sufficient admissible evidence in the record."
 {¶ 4} "The manifest weight of the admissible evidence in the record does not support Mr. Bergsmark's conviction."
 Bergsmark's First and Second Assignment of Error {¶ 5} Since both assignments of error are interrelated, they will be addressed together. We find that there was sufficient evidence to support Bergsmark's conviction, and that the conviction was supported by the manifest weight of the evidence.
 {¶ 6} Manifest weight of the evidence means that a greater amount of credible evidence supports one side of an issue more than the other. State v. Thompkins (1997), 78 Ohio St.3d 380,387, quoting Black's Law Dictionary (6 Ed. 1990) 1594. To determine whether this is an exceptional case where the evidence weighs heavily against conviction, an appellate court must review the record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. Id., quoting State v.Martin (1983), 20 Ohio App.3d 172, 175. Here, the factfinder was the trial judge who heard testimony, observed body language, evaluated voice inflections, observed hand gestures, perceived the interplay between witness and examiner, and watched each witness's reaction in the courtroom. During appellate review, we are to accord due deference to the credibility determinations made by the factfinder. See State v. DeHass (1967),10 Ohio St.2d 230, at paragraph one of the syllabus. Only if we conclude that the trier of fact clearly lost its way in resolving conflicts in evidence and created a manifest miscarriage of justice will we reverse the conviction and order a new trial.
 {¶ 7} Sufficiency of the evidence asks whether the evidence is legally adequate to support a verdict on all elements of an offense. State v. Thompkins (1997), 78 Ohio St.3d 380, 386-387. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, at paragraph two of the syllabus, following Jacksonv. Virginia (1979), 443 U.S. 307.
 {¶ 8} Because sufficiency is required to survive a motion for acquittal, a finding that a conviction is supported by the weight of the evidence necessarily includes a finding of sufficiency. Thus, a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency. Lakewood v. Dorton, 8th Dist. No. 81043, 2003-Ohio-1719, at ¶ 32, citing State v. Roberts (Sept. 17, 1997), Lorain App. No. 96CA006462.
 {¶ 9} As for what value should be given to different types of evidence, it is firmly established that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof. When the state relies on circumstantial evidence to prove an essential element of the offense charged, there is no need for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction."State v. Jenks (1991), 61 Ohio St.3d 259, at paragraph one of the syllabus. Under Ohio law, a defendant may be convicted solely on the basis of circumstantial evidence. State v. Nicely
(1988), 39 Ohio St.3d 147, 151.
 Passing Bad Checks {¶ 10} R.C. 2913.11(A) states that "[n]o person, with the purpose to defraud, shall issue or transfer or cause to be issued or transferred a check or other negotiable instrument, knowing that it will be dishonored." This offense has four key elements: (1) a purpose to defraud; (2) issuing, transferring, or causing to be issued or transferred; (3) a check or negotiable instrument; (4) knowledge that it will be dishonored. State v.Echeandia (May 25, 1979), 6th Dist. No. L-78-188. It was not disputed that a check was issued; thus, the second and third elements were met. The questions are whether there was a purpose to defraud and knowledge that the check would be dishonored.
 Purpose to Defraud {¶ 11} R.C. 2901.22(A) states that "[a] person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature. "Defraud" is defined by R.C. 2913.01(B) as "to knowingly obtain, by deception, some benefit for oneself or another, or to knowingly cause, by deception, some detriment to another." "Deception," under R.C. 2913.01(A), "means knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact." Finally, R.C. 2901.22(B) states that "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
 {¶ 12} With respect to purpose or intent to defraud in passing bad check cases, financial damage is not necessary to the existence of a fraud. State v. Lowenstein (1924),109 Ohio St. 393, 400. Fraud exists where the check writer gains any type of advantage as a result of his or her actions. State v. Hedrick
(1994), 92 Ohio App.3d 618, 620. See also, State v. Smith, 5th Dist No. 2002CA306, 2003-Ohio-2033, at ¶ 47.
 {¶ 13} The terms "advantage" and "benefit" have not been interpreted to require that something of value be obtained as a result of the deception. State v. Doane (1990),69 Ohio App.3d 638,650. The terms are viewed broadly. State v. Jenkins (Apr. 23, 1999), 11th Dist. No. 97-L-303 (creditor thinks that a debt has been paid); State v. Valentine (July 18, 1988), 12th Dist. No. CA87-07-091 (victim does not get consideration for property exchange); State v. Suber, 154 Ohio App.3d 681, 2003-Ohio-5210, at ¶ 40 (delay and confusion caused). As in this case, most importantly, the benefit or advantage can be the delayed departure of employees from a company who do not know that they will not be paid for their services. See State v. Wamsley, 12th Dist. No. CA2002-05-109, 2003-Ohio-1872.
 {¶ 14} Where a defendant has no reasonable ground to believe the funds in his bank account are sufficient to cover checks issued, an inference of intent to defraud arises. State v.Hines (July 3, 1995), 12th Dist. No. CA94-09-182. Even though the defendant does not know the exact amount in the bank account and the bank has been allowing the account to be overdrawn, if checks are written with knowledge of insufficient funds in the account and the checks are never honored, intent to defraud is present. State v. Wamsley, 12th Dist. No. CA2002-05-109, 2003-Ohio-1872. A defendant is not shielded because someone else's name appears on the checks, especially when there is no "reasonable expectation of payment," and the signatory on the check works at the defendant's behest. State v. Stemen (1951),90 Ohio App. 309, 315-316.
 Knowledge of Dishonor {¶ 15} Under certain circumstances there is a presumption that the check will be dishonored. R.C. 2913.11(B) states in pertinent part: "For purposes of this section, a person who issues or transfers a check or other negotiable instrument is presumed to know that it will be dishonored if either of the following occurs: * * * (2) The check or other negotiable instrument was properly refused payment for insufficient funds upon presentment within thirty days after issue or the stated date, whichever is later, and the liability of the drawer, indorser, or any party who may be liable thereon is not discharged by payment or satisfaction within ten days after receiving notice of dishonor." This presumption, however, does not need to be proved for a conviction for passing bad checks.State v. Brown (July 13, 1994), 9th Dist. No. 2291-M. Where the state chooses not to rely upon the statutory presumption or the presumption is inapplicable, the knowledge element may be proven by means other than evidence of presentment and dishonor. Statev. Hines (July 3, 1995), 12th Dist. No. CA94-09-182.
 {¶ 16} Knowledge of dishonor has been found where a check is written on an account that has been closed. State v. Capelle
(Dec. 8, 1995), 3d Dist. No. 3-95-21. It has also been found where there is a recognized insufficient amount of money in a checking account, yet the total amount of the issued check or checks is for an amount that is for more than what is in the account. State v. Davidson (Oct. 26, 1977), 9th Dist. No. 1494. Most importantly, however, knowledge of dishonor has been found to be present where a discernable insufficient amount of money exists in a bank account, the bank instructs the defendant not to write any more checks on that account, but checks are written anyway. State v. Hines (July 3, 1995), 12th Dist. No. CA94-09-182.
 Evidence of Passing Bad Checks {¶ 17} The record shows that Bergsmark was the owner of Cavista Corporation, which had a number of subsidiaries — including Cavalear Realty Company. By autumn of 2001, Cavista was in the midst of a dire financial situation, habitually in overdraft at KeyBank, and unable to pay off its loans. As the trial court remarked at the sentencing hearing where it could articulate its view of the evidence, "[t]here was simply not enough money on deposit to cover the checks that were being written on behalf of Cavista and its subsidiaries."
 {¶ 18} As a result of Cavista's chronic overdraft, KeyBank had Dale Clayton, one of its commercial loan workout relationship managers, assigned to the Cavista account to remedy the problem. Clayton was in almost daily contact with Cavista from October of 2001 until the close of business on December 27, 2001. At Cavista, he primarily dealt with Bergsmark and Cheryl Griem — the Chief Financial Officer. The trial court correctly noted at the sentencing hearing that "[t]he undisputed testimony is that the bank would advise Cavista of the amount of deposits and the outstanding checks and in situations where there were not enough deposits to cover the checks, Cavista would make a determination as to which checks would be honored. It's also undisputed that the defendant was aware of this situation and that he participated in the decisions as to which checks to pay and which checks should be issued."
 {¶ 19} By December, Cavista's situation further worsened because a number of financial institutions, including KeyBank, were foreclosing on their loans and filing lawsuits. Still, checks were being written on the overdrawn KeyBank checking account. Clayton testified that "we needed to come up with a different means of handling checks going forward, because we could not tolerate any more overdrafts. We — it was undermining any chance we had of trying to work through the situation. And I, you know, I specifically recall if not this day [December 6, 2001], but maybe prior, previous days, instructing them [Bergsmark and Griem] to stop writing checks. Stop writing checks." Clayton also recounted another conversation that he had with Bergsmark later in December where Bergsmark asked Clayton what to do: "I remember saying, well, stop writing checks. I mean, that's the only way we can get out of it, is we — you can't write more checks than you have money coming in."
 {¶ 20} Clayton's injunction to stop writing checks went unheeded, in spite of his warning to Bergsmark that checks would no longer be honored. Griem testified that Bergsmark insisted that Cavista's rule of paying its brokers 24 hours after a sale was completed would still be followed — even after he knew that the bank was dishonoring the checks. The trial court remarked at sentencing, "[t]he defendant was advised that there were insufficient funds to pay all the checks that were being issued, but he directed that checks continue to be issued. As a result, between December 13th and December 20th, 2001 twelve checks were issued to real estate agents of Cavalear Realty for commissions. These checks were dishonored. They bounced. The total amount of these checks was $38,667.26."
 {¶ 21} Based on our through review of the record, we affirm that the evidence supports 12 findings of guilty for passing bad checks.
 Forgery {¶ 22} R.C. 2913.31(A)(2) describes the type of forgery involved in this case and states that "[n]o person, with purpose to defraud, or knowing that the person is facilitating a fraud, shall * * * [f]orge any writing so that it purports to be genuine when it actually is spurious, or to be the act of another who did not authorize that act, or to have been executed at a time or place or with terms different from what in fact was the case, or to be a copy of an original when no such original existed * * *." In other words, a "forgery requires a writing which purports to be genuine but is in fact spurious." State v. Lutz, 8th Dist. No. 80241, 2003-Ohio-275, at ¶ 71.
 {¶ 23} Once again, the focus is upon whether there was intent to defraud, and the same definitions of purposely, defraud, deception, and knowingly apply. See, R.C. 2901.22(A); R.C.2901.22(B); R.C. 2913.01(A); and R.C. 2913.01(B). Thus, we must determine, after reviewing the record, whether Bergsmark "intended to defraud, or that he knew or should have known, that he was facilitating a fraud * * *." State v. Murray (Feb. 6, 1989), 12th Dist. No. CA88-05-038.
 {¶ 24} At trial, the state was required to prove the required mental state. State v. Tiger, 148 Ohio App.3d 61,2002-Ohio-320, at ¶ 11. Purpose or intent can be established by circumstantial evidence from the surrounding facts and circumstances. Id. at ¶ 13. The main question is whether Bergsmark had a purpose or intention to benefit himself not whether he actually received a benefit or caused someone to suffer a detriment. To have purpose to defraud, "one must merely knowingly intend to obtain some benefit or cause some detriment to another by way of deception." State v. Lee (Nov. 23, 1983), 4th Dist. No. 82 X 16.
 {¶ 25} Intent to defraud has been found to be present in a number of scenarios: when a victim incurred additional interest on a draw, and the defendant received payment for work not done,State v. Murray (Feb. 6, 1989), 12th Dist. No. CA88-05-038; when a phony hospital computer list was submitted to an insurance company as authentic, State v. Shanely (Feb. 9, 1994), 2d Dist No. 92-CA-68; when a bank account was opened using a false name and fake license, the benefit was minor, and the bank suffered no detriment, State v. Tiger, 148 Ohio App.3d 61, 2002-Ohio-320, at ¶ 14; and when a defendant "had no objective reason to believe" a writing was what it purported to be. State v. Lutz,
8th Dist No. 80241, 2003-Ohio-275, at ¶ 37.
 Evidence of Forgery {¶ 26} The evidence shows that James Thurston needed to live in the City of Toledo to keep his job as Commissioner of Housing because of a provision in the city charter. The Mayor of Toledo at the time, Carleton Finkbeiner, insisted that all of the members of his administration lived in Toledo. Thurston lived in Perrysburg Township, and he shared his residency concerns with Bergsmark. Bergsmark responded by stating to Thurston that "if you need a city residency to get the mayor off your back, we have lots of vacant apartments. You can use one of those addresses."
 {¶ 27} Bergsmark then had one of his employees, John Glanville, prepare a lease for an apartment at 2515 West Bancroft Street in Toledo. Glanville had some concerns because the lease being prepared had many important details left unaddressed. He testified that Bergsmark was very explicit about what he wanted: "he gave me very narrow instructions. And they were to prepare the lease, get it signed by Jim Thurston. That was all that I was supposed to do." The apartment that Bergsmark was renting to Thurston was not habitable. Aside from that, as Glanville testified, the building "was still owned by the Cubbon family. Ed Bergsmark instructed me to do it. He gave me very narrow instructions and that's exactly what I did."
 {¶ 28} Thurston never paid any rent for the apartment. Bergsmark directed Glanville to write a letter telling Thurston that he should pay his rent and to contact Bergsmark if he had any questions. As a result, Thurston contacted Bergsmark about the unpaid rent for the apartment and stated, "I don't feel that I owe you any money. I never moved into that apartment and I don't owe any money on it." However, Bergsmark was unconcerned and told Thurston to forget about the unpaid rent. Thurston testified that it was clear from the conversation that Bergsmark was more concerned why the city was selling a property he was interested in to an out-of-town developer than any rent money Thurston owed.
 {¶ 29} After thorough review, we agree the record supports the findings relied on by the trial court during sentencing: "In short, the defendant and Mr. Thurston forged a lease to deceive the city so that Mr. Thurston could keep his job." Bergsmark was properly convicted of forgery.
 {¶ 30} As this was a bench trial in a criminal case, it is presumed the court considered only relevant, material, and competent evidence in arriving at its judgment unless the contrary affirmatively appears. State v. Poelking, 8th Dist No. 78697, 2002-Ohio-1655; State v. Post (1987),32 Ohio St.3d 380, 384; State v. White (1968), 15 Ohio St.2d 146, 151. Nothing in the record suggests the trial judge considered any irrelevant, immaterial, or incompetent evidence. Bergsmark's conviction was thus supported by sufficient evidence as well as the manifest weight of the evidence, and both of Bergsmark's assignments of error are found not well-taken.
 {¶ 31} The judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the court costs of this appeal as specified under App.R. 24.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Richard W. Knepper, J., Judith Ann Lanzinger, J., ArleneSinger, J.