[Cite as *State v. Shanklin*, 2014-Ohio-5624.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                         CASE NO.  14-13-23

    v.

GEORGE A. SHANKLIN,                        O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Union County Common Pleas Court
Trial Court No. 08-CR-0103

**Judgment Affirmed**

**Date of Decision:  December 22, 2014**

APPEARANCES:

    *Alison Boggs* **for Appellant**

    *David W. Phillips and Thayne D. Gray* **for Appellee**

**PRESTON, J.**

{¶1} Defendant-appellant, George A. Shanklin ("Shanklin"), appeals the November 7, 2013 judgment entry of sentence of the Union County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} On August 6, 2008, the Union County Grand Jury indicted Shanklin on five counts, including: Count One of aggravated theft in violation of R.C. 2913.02(A)(3), (B)(2), a second-degree felony;[1] Count Two of passing bad checks in violation of R.C. 2913.11(B), (F), a fifth-degree felony; Count Three of passing bad checks in violation of R.C. 2913.11(B), (F), a fourth-degree felony; Count Four of passing bad checks in violation of R.C. 2913.11(B), (F), a fourth-degree felony; and Count Five of engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(1), a second-degree felony.[2] (Doc. No. 1). After Shanklin was indicted, a warrant was issued for his arrest and bond was set at $50,000 cash or surety. (Doc. Nos. 2, 3, 5).

{¶3} On October 9, 2008, Shanklin entered pleas of not guilty at arraignment, and the trial court increased Shanklin's bond to $100,000 cash or surety. (Doc. No. 6). On October 14, 2008, Shanklin posted a $100,000 surety bond through HLS Bonding, International Fidelity Insurance Company ("the bond

---

[1] Due to a change in the statute, the parties in the plea agreement stated, "[W]ith the change in law HB 86, this offense of Aggravated Theft is now a felony of the third degree with the value of the property or services stolen is one hundred fifty thousand dollars or more and is less than seven hundred fifty thousand dollars." (Doc. No. 209). *See also* Am.Sub.H.B. 86, 2011 Ohio Laws 29.

[2] The charge was amended to a first-degree felony on February 15, 2013. (Feb. 15. 2013 Tr. at 4).

company") as the surety. (Doc. No. 10). An extradition waiver was also filed. (Doc. No. 11).

**{¶4}** On February 2, 2010, Shanklin failed to appear at a change-of-plea hearing. (Feb. 2, 2010 JE, Doc. No. 135). As a result, the trial court placed the case on inactive status, revoked Shanklin's bond, issued a warrant for his arrest, and ordered the bond company to produce him within 30 days. (*Id.*). The trial court noted that the State may seek to have Shanklin's bond forfeited if the bond company did not produce Shanklin within the 30 days. (*Id.*). Shanklin was not apprehended until January 2012 when he was apprehended in California and extradited to Ohio. (Doc. No. 154). Because Shanklin was out of the jurisdiction for almost two years, the trial court ordered his bail forfeited. (*See* July 23, 2010 JE, Doc. No. 144); (Feb. 22, 2011 JE, Doc. No. 150). The bond company agreed to remit the $100,000 bond it posted for Shanklin, and the trial court disbursed the proceeds. (*Id.*); (*Id.*). (*See also* July 23, 2010 JE, Doc. No. 145); (Feb. 23, 2012 JE, Doc. No. 153).

**{¶5}** On February 15, 2013, the trial court held a change-of-plea hearing. (Doc. No. 209). Pursuant to a negotiated plea agreement, Shanklin pled guilty to Counts One and Four and the State dismissed Counts Two, Three, and Five. (*Id.*). The trial court accepted Shanklin's pleas and found him guilty as to Counts One and Four. (Feb. 15, 2013 Tr. at 18). After continuing sentencing a number of

times at Shanklin's request so he could arrange payment of restitution, court costs, and fees, the trial court sentenced Shanklin on November 7, 2013 to 30 months imprisonment as to Count One and 17 months imprisonment as to Count Four, to be served consecutively. (Nov. 7, 2013 JE, Doc. No. 225). The trial court granted Shanklin 609 days of credit for time already served as of the date of his sentencing.[3] (*Id.*). Further, the trial court ordered Shanklin to pay $136,626.09 in restitution and to pay for his jail time, court costs, costs of prosecution, and fees under R.C. 2929.18. (*Id.*). On November 19, 2013, the trial court clarified that Shanklin was to pay $140,763.14 in court costs, fines, and restitution. (Nov. 19, 2013 JE, Doc. No. 229).

{¶6} On December 6, 2013, Shanklin filed his notice of appeal. (Doc. No. 234). He raises four assignment of error for our review.

### Assignment of Error No. I

**The trial court erred when it failed to merge the charges of aggravated theft and passing bad checks for sentencing purposes, as the charges are allied offenses of similar import.**

{¶7} In his first assignment of error, Shanklin argues that the aggravated theft and passing bad checks offenses for which he was convicted were allied offenses of similar import and that the trial court erred by not merging them for

---

[3] The record reflects Shanklin filed a motion on April 3, 2014 requesting an additional 62 days of jail-time credit. (Doc. No. 249). The State filed a memorandum on April 10, 2014 in which it did not oppose granting Shanklin an additional 62 days of jail-time credit. (Doc. No. 250). However, the record does not reflect any judgments of the trial court granting Shanklin's motion.

purposes of sentencing. Specifically, Shanklin argues that because Count Five of the indictment stated, "Between the dates of June 28, 2005 through October 31, 2005 in a continuing course of criminal conduct in the furtherance of the same conspiracy and/or similar modus operandi * * *," he recognized that passing bad checks was part of a continuing course of conduct related to a loan for vehicles that he fraudulently induced Daimler Chrysler Financial Services ("DCFS") into entering. As such, he argues that the two offenses for which he was convicted should have been merged.

{¶8} Whether offenses are allied offenses of similar import is a question of law that this Court reviews de novo. *State v. Stall*, 3d Dist. Crawford No. 3-10-12, 2011-Ohio-5733, ¶ 15, citing *State v. Brown*, 3d Dist. Allen No. 1-10-31, 2011-Ohio-1461, ¶ 36.

R.C. 2941.25, Ohio's multiple-count statute, states:

(A)  Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B)  Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or

> with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

In determining whether offenses are allied offenses of similar import under R.C. 2941.25, the court must first determine whether it is possible to commit both offenses with the same conduct. *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, ¶ 48. "If the multiple offenses can be committed with the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.'" *Id.* at ¶ 49, quoting *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, ¶ 50 (Lanzinger, J., dissenting).

**{¶9}** If it is possible to commit the offenses with the same conduct and the defendant did, in fact, commit the multiple offenses with the same conduct, then the offenses are allied offenses of similar import and will merge. *Id.* at ¶ 50. However, "if the court determines that the commission of one offense will *never* result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each, then according to R.C. 2941.25(B), the offenses will not merge." (Emphasis sic.) *Id.* at ¶ 51. "The Supreme Court of Ohio has defined animus as 'purpose, or more properly, immediate motive.'" *State v. Hadding*, 3d Dist. Auglaize No. 2-12-14,

2013-Ohio-643, ¶ 14, quoting *State v. Logan,* 60 Ohio St.2d 126, 131 (1979). "'The defendant bears the burden to prove entitlement to merger.'" *State v. Love*, 3d Dist. Marion No. 9-13-09, 2014-Ohio-437, ¶ 25, quoting *State v. Forney*, 2d Dist. Champaign No. 2012-CA-36, 2013-Ohio-3458, ¶ 10.

{¶10} Here, Shanklin was convicted of aggravated theft, under R.C. 2913.02(A)(3), and passing bad checks, under R.C. 2913.11(B). R.C. 2913.02(A)(3) provides: "No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either property or services * * * [b]y deception." R.C. 2913.11(B) provides: "No person, with purpose to defraud, shall issue or transfer or cause to be issued or transferred a check or other negotiable instrument, knowing that it will be dishonored or knowing that a person has ordered or will order stop payment on the check or other negotiable instrument."

{¶11} We must first determine whether it is possible to commit the offenses of aggravated theft and passing bad checks with the same conduct. *Johnson* at ¶ 48. Applying *Johnson*, at least two districts have determined that theft offenses and passing bad checks can be committed by the same conduct. *State v. Rogers*, 2d Dist. Greene No. 2011 CA 0057, 2012-Ohio-4451, ¶ 14 ("It is possible, in committing the offense of passing bad checks, to knowingly obtain control over the property or services of a person who provides the property or services in

-7-

exchange for the bad check, when the actor has the purpose of depriving the owner of the property or services he provided."); *State v. Snyder*, 12th Dist. Butler No. CA2011-02-018, 2011-Ohio-6346, ¶ 19-20 (finding that it is possible to commit the offenses of grand theft by deception and passing bad checks with the same conduct). We agree and conclude that it is *possible* to commit the offenses of aggravated theft in violation of R.C. 2913.02(A)(3) and passing bad checks in violation of R.C. 2913.11(B) with the same conduct.

{¶12} Because we determined that it is possible to commit the two offenses by engaging in the same conduct, we must determine if Shanklin committed aggravated theft and passing bad checks—as alleged in Counts One and Four of the indictment—separately or with a separate animus to each. *Rogers* at ¶ 14, citing *Johnson* at ¶ 50-51. Shanklin argues that because Count Five of the indictment charged him with engaging in a continuing course of criminal conduct from June 28, 2005 through October 31, 2005, his acts under Counts One and Four should be considered the same conduct under *Snyder*. *See Snyder* at ¶ 23-24. The defendant in *Snyder* was convicted of one count of grand theft by deception and three counts of passing bad checks. *Id.* at ¶ 1. In the grand-theft-by-deception count, Snyder was charged with engaging in a continuing course of criminal conduct from January 26, 2009 through March 3, 2009. *Id.* at ¶ 22. During that time, Snyder issued three bad checks—one on February 11, 2009 and two on

February 18, 2009. *Id.* The Twelfth District Court of Appeals concluded that Snyder's grand-theft-by-deception and passing-bad-checks convictions were allied offenses of similar import and subject to merger because, in part, Snyder issued the bad checks during the continuing course of conduct alleged in the grand-theft-by-deception count of the indictment. *Id.* ¶ 25, 33. However, the decision in *Snyder* is inapplicable to the facts in this case for the reasons that follow.

{¶13} Pursuant to a negotiated plea agreement, Shanklin pled guilty to Counts One and Four and the State dismissed Counts Two, Three, and Five. The offenses of aggravated theft and passing bad checks—as alleged in Counts One and Four of the indictment—were charged in discrete counts in the indictment, and no continuing course of conduct in relation to the two offenses was alleged. *Compare Rogers* at ¶ 9 *with Snyder* at ¶ 22, 25. In addition, unlike the defendant in *Snyder*, Shanklin did not issue the bad check to obtain the loan for the vehicles. *Compare Snyder* at ¶ 31-32 (concluding that Snyder committed grand theft by deception and passing bad checks with the same animus because Snyder issued bad checks to obtain steel studs).

{¶14} In Count One of the indictment, Shanklin was charged with having the "purpose to deprive the owner of property or services" by "knowingly obtain[ing] or extert[ing] control over the property or services by deception" "[o]n

or about June 28, 2005 through August 15, 2005." (Doc. No. 1). During that period of time, Shanklin entered a contract valued at $598,938.00 to purchase or lease a fleet of 13 vehicles—one Jeep Grand Cherokee, three Mercedes, and nine Dodge Sprinter vans—to use in his dry cleaning business and, subsequently, took possession of the 13 vehicles. (Doc. Nos. 4, 14); (Feb. 15, 2013 Tr. at 15-16). To obtain the vehicles, Shanklin provided documents to Nelson Auto Group in Marysville, Ohio that falsely inflated the value of his business. (Feb. 15, 2013 Tr. at 15). Shanklin provided the false documents to Nelson Auto Group to secure financing from DCFS to purchase or lease the vehicles. (*Id.*). In an interview with the Marysville Police Department on June 7, 2006, Shanklin stated that he knew that if he provided DCFS with accurate information, DCFS would not loan him the money for the vehicles. (Shanklin Inter., Doc. No. 73 at 7). Thus to obtain the loan, Shanklin falsely inflated the value of his business by altering the 2003 and 2004 financial records of his company. (*Id.* at 4). He also provided a false credit questionnaire and credit application. (Feb. 15, 2013 Tr. at 15-16). Accordingly, between June 28, 2005 and August 15, 2005, Shanklin knowingly deceived DCFS by misrepresenting the value of his business to induce DCFS into loaning him the money for the vehicles. *See State v. Edmondson*, 92 Ohio St.3d 393, 397 (2001), citing R.C. 2913.01(A) (defining "deception" to include "any false or misleading representation * * * that creates, confirms, or perpetuates a false impression in

another"). During that same period of time, Shanklin knowingly obtained control over the vehicles with the purpose to deprive DCFS of them. *Id.*

Second, in Count Four of the indictment, it was alleged that:

"[o]n or about October 31, 2005 * * *, Shanklin with purpose to defraud, did issue or transfer or cause to be issued or transferred a check or other negotiable instrument, knowing that it would be dishonored, and the check or other negotiable instrument was issued or transferred to a single vender for the payment of five thousand dollars or more but less than one hundred thousand dollars."

(Doc. No. 1). A discussion of the offense demonstrates how Shanklin's actions in passing the bad check were committed separately and with separate animus to his actions as alleged in Count One of the indictment.

{¶15} "With respect to purpose or intent to defraud in passing bad check cases, financial damage is not necessary to the existence of a fraud." *State v. Bergsmark*, 6th Dist. Lucas No. L-03-1137, 2004-Ohio-5753, ¶ 12, citing *State v. Lowenstein*, 109 Ohio St. 393, 400 (1927). *See also* R.C. 2913.01(B) (defining "defraud" as "to knowingly obtain, by deception, some benefit for oneself or another, or to knowingly cause, by deception, some detriment to another"). "Fraud exists where the check writer gains any type of advantage as a result of his or her actions." *Id.*, citing *State v. Hedrick*, 92 Ohio App.3d 618, 620 (2d

Dist.1994) and *State v. Smith*, 5th Dist. Stark No. 2002CA306, 2003-Ohio-2033, ¶ 47. "The terms 'advantage' and 'benefit' have not been interpreted to require that something of value be obtained as a result of the deception." *Id.* at ¶ 13, citing *State v. Doane*, 69 Ohio App.3d 638, 650 (11th Dist.1990).

{¶16} On October 31, 2005, Shanklin issued a check for $20,463.73 from his account with Fifth Third Bank, which was closed by Fifth Third Bank on or about September 29, 2005. (Feb. 15, 2013 Tr. at 16); (Doc. No. 15). In the presentence investigation ("PSI") report, Shanklin stated, "Once I got too deep and spread too thin in the proposed acquisitions, my cash flow suffered dramatically. I did everything humanly possible to keep the business operating, thinking if I could just hold on things would work out. Writing a bad check just postponed the inevitable * * *." (PSI at 4). Thus, Shanklin admitted that he issued the bad check to obtain the benefit of "postpon[ing] the inevitable." Therefore, on October 31, 2005, Shanklin knowingly defrauded DCFS by issuing a check for $20,463.73 from a closed account knowing that it would be dishonored.

{¶17} Consequently, Shanklin's conduct—as alleged in Counts One and Four of the indictment—was not part of a continuing course of conduct or committed with the same purpose or immediate motive. Instead, his conduct was committed separately and with a separate animus for each. Shanklin provided documents falsely inflating the value of his business to obtain the loan from

DCFS. The theft offense was complete once he took possession of the vehicles after inducing DCFS to lending the money to him based on the false information he provided. *See State v. Ballard*, 8th Dist. Cuyahoga No. 98355, 2013-Ohio-373, ¶ 14. Separate from that, Shanklin intended to defraud DCFS by issuing a check on a closed account that he knew would be dishonored. "'Because one offense was complete before the other offense occurred, the two offenses were committed separately for purposes of R.C. 2941.25(B), notwithstanding their proximity in time and that one was committed in order to commit the other.'" *State v. Sludder*, 3d Dist. Allen No. 1-11-69, 2012-Ohio-4014, ¶ 14, quoting *State v. Turner,* 2d Dist. Montgomery No. 24421, 2011-Ohio-6714, ¶ 24. In addition, Shanklin did not commit the offenses with the same purpose or immediate motive—that is, Shanklin intended to deceive DCFS by misrepresenting the value of his business to obtain a loan from DCFS for the vehicles and, later, Shanklin intended to defraud DCFS by issuing the bad check to "postpone[] the inevitable." *See Rogers*, 2012-Ohio-4451, at ¶ 15. Therefore, we conclude that the two offenses were committed separately and with a separate animus for each, and merger is avoided under R.C. 2941.25(B).

{¶18} For these reasons, Shanklin's first assignment of error is overruled.

**Assignment of Error No. II**

**The trial court erred when it failed to conduct a separate hearing to determine the exact amount of restitution due the victim.**

{¶19} In his second assignment of error, Shanklin argues that it was error for the trial court not to conduct a separate hearing to determine the exact amount of restitution due to the victim.

{¶20} Shanklin concedes that he did not object to the restitution ordered by the trial court. "A failure to object to the trial court's award of restitution waives all but plain error." *State v. Stewart*, 3d Dist. Wyandot No. 16-08-11, 2008-Ohio-5823, ¶ 7, citing *State v. Marbury*, 104 Ohio App.3d 179, 181 (8th Dist.1995) and Crim.R. 52(B). "In order to have plain error under Crim.R. 52(B), there must be an error, the error must be an 'obvious' defect in the trial proceedings, and the error must have affected 'substantial rights.'" *Id.*, citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). "Plain error exists only in the event that it can be said that 'but for the error, the outcome of the trial would clearly have been otherwise.'" *Id.*, quoting *State v. Biros*, 78 Ohio St.3d 426, 431 (1997). "Plain error is to be used 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Id.*, quoting *Barnes* at 27. "[I]mposition of a sentence not authorized by statute constitutes

plain error." *Id.*, citing *State v. Rhoda,* 135 Ohio App.3d 21, 25 (3d Dist.1999) and *State v. Samuels*, 4th Dist. Washington No. 03CA8, 2003-Ohio-6106, ¶ 9.

**{¶21}** R.C. 2929.18 governs financial sanctions that are imposed by a trial court, and, in pertinent part, states:

(A) * * * Financial sanctions that may be imposed pursuant to this section include, but are not limited to, the following:

(1) Restitution by the offender to the victim of the offender's crime or any survivor of the victim, in an amount based on the victim's economic loss. If the court imposes restitution, the court shall order that the restitution be made to the victim in open court, to the adult probation department that serves the county on behalf of the victim, to the clerk of courts, or to another agency designated by the court. If the court imposes restitution, at sentencing, the court shall determine the amount of restitution to be made by the offender. If the court imposes restitution, the court may base the amount of restitution it orders on an amount recommended by the victim, the offender, a presentence investigation report, estimates or receipts indicating the cost of repairing or replacing property, and other information, provided that the amount the court orders as restitution shall not exceed the amount of the economic loss suffered by the

victim as a direct and proximate result of the commission of the offense. If the court decides to impose restitution, the court shall hold a hearing on restitution *if the offender, victim, or survivor disputes the amount.* All restitution payments shall be credited against any recovery of economic loss in a civil action brought by the victim or any survivor of the victim against the offender.

(Emphasis added.) R.C. 2929.18(A)(1). The statute is clear that a trial court must hold a hearing on restitution if the offender *disputes* the amount of restitution. *State v. Lamere*, 3d Dist. Allen No. 1-07-11, 2007-Ohio-4930, ¶ 10. *See also State Lalain*, 136 Ohio St.3d 248, 2013-Ohio-3093, ¶ 22-23. Absent such a challenge, the statute grants the trial court the authority to order restitution "in an amount based on the victim's economic loss" as established by "an amount recommended by the victim, the offender, a presentence investigation report, estimates or receipts indicating the cost of repairing or replacing property, and other information." *State v. Halcomb*, 3d Dist. Seneca No. 13-12-13, 2013-Ohio-1301, ¶ 31, citing R.C. 2929.18(A)(1). *See also State v. Buckeye Truck & Trailer Leasing, Inc.*, 187 Ohio App.3d 309, 2010-Ohio-1699, ¶ 26 (6th Dist.). "[T]he amount of restitution must bear a reasonable relationship to the loss suffered." *State v. Estes*, 3d Dist. Seneca No. 13-11-14, 2011-Ohio-5740, ¶ 20, quoting *Marbury*, 104 Ohio App.3d at 181. "There must be competent and credible

evidence in the record from which the court may ascertain the amount of restitution to a reasonable degree of certainty." *Id.*

**{¶22}** We conclude that it was not plain error for the trial court not to conduct a hearing to determine the exact amount of restitution due to the victim or for the trial court to order Shanklin to pay restitution in the amount of $136,626.09. *State v. Wilkins*, 3d Dist. Shelby No. 17-13-13, 2014-Ohio-983, ¶ 11. First, at the November 7, 2013 sentencing hearing, Shanklin's trial counsel did not object to the amount of restitution. Since there was no dispute as to the amount of restitution, the trial court was not required to hold a hearing. *Buckeye Truck & Trailer Leasing, Inc.* at ¶ 26 ("By the clear language of the restitution statute, a court need only hold a hearing on the award if one of the named actors disputes the amount.").

**{¶23}** Second, the trial court ordered restitution in an amount recommended by the State, which was based on DCFS's economic loss as established by its victim-impact statement. R.C. 2929.18(A)(1) allows the trial court to base the amount of restitution it orders "on amount recommended by the victim," "a presentence investigation report," or "other information, provided that the amount the court orders as restitution shall not exceed the amount of the economic loss suffered by the victim as a direct and proximate result of the commission of the offense." *Wilkins* at ¶ 12; R.C. 2929.18(A)(1). DCFS's victim-impact statement,

which was also included in the PSI, asserted that its economic loss was $243,148.17. (Doc. No. 4); (PSI). "Economic loss is defined by R.C. 2929.01(L) as, 'any economic detriment suffered by a victim as a direct and proximate result of the commission of an offense and includes any loss of income due to lost time at work because of any injury caused to the victim, and any property loss, medical cost, or funeral expense incurred as a result of the commission of the offense.'" *Halcomb* at ¶ 31, quoting R.C. 2929.01(L). "Restitution is limited to the actual economic loss, which requires that any losses be offset by any gains." *State v. Love*, 3d Dist. Marion No. 9-13-09, 2014-Ohio-437, ¶ 57, citing *State v. Clayton*, 2d Dist. Montgomery No. 22937, 2009-Ohio-7040, ¶ 56.

{¶24} In its victim-impact statement, DCFS asserted that its economic loss was based on the total contract value less the amount it was able to recapture after repossessing and reselling the vehicles. (Doc. No. 4).[4] The State recommended restitution in an amount less than this. At oral argument, the State clarified that it further offset the amount of restitution requested by DCFS by deducting interest and finance charges that were built into the original contract price. Thus, not only was the amount of restitution requested by DCFS offset by its mitigation efforts in repossessing and reselling the vehicles, but the State further offset that amount to Shanklin's benefit by deducting additional interest and finance charges built into

---

[4] We note that the victim-impact statement reflects only 12 vehicles and does not include any value for the Jeep Grand Cherokee. (*See* Doc. No. 4).

the original contract price. Accordingly, the trial court based the amount of restitution on "other information" recommended by the State that did not exceed the economic loss asserted by DCFS as a direct and proximate loss of Shanklin's conduct. Therefore, there was competent, credible evidence that DCFS's economic detriment—namely, the loss in value of the vehicles less additional interest and finance charges in the amount of $136,626.09—was directly and proximately related to Shanklin's offenses and bore a reasonable relationship to the loss it suffered. Thus, the trial court did not err in ordering Shanklin to pay restitution in the amount of $136,626.09.

{¶25} We also note that Shanklin appears to argue that his $100,000 bail forfeiture should have been applied toward his restitution and court costs under R.C. 2937.40. Specifically, Shanklin avers, "It is unclear from the record if the court applied any of the forfeited bail money to Appellant's restitution and other costs, even though it had the authority to do so." However, Shanklin's contention is erroneous as there were neither bail proceeds posted by Shanklin on his own behalf nor bail proceeds remaining in his case.[5] *See* R.C. 2937.40(A)-(C). *See also* R.C. 2937.35; R.C. 2937.36.

{¶26} Therefore, Shanklin's second assignment of error is overruled.

---

[5] Shanklin did not appeal from the trial court's judgment entries of July 23, 2010, February 22, 2011, and February 23, 2012 declaring his bail forfeited, executing judgment against the bond company, and distributing the forfeited proceeds. (*See* July 23, 2010 JE, Doc. No. 144); (Feb. 22, 2011 JE, Doc. No. 150); (Feb. 23, 2012 JE, Doc. No. 153). *See also* App.R. 3(A); App.R. 4(A).

## Assignment of Error No. III

**Appellant was deprived effective assistance of counsel when counsel failed to identify for the court that the aggravated theft and passing bad check charges were allied offenses of similar import and the failure to object to the restitution amount.**

{¶27} In his third assignment of error, Shanklin argues that he was deprived the effective assistance of trial counsel. In particular, Shanklin argues that his trial counsel failed to raise with the trial court that the offenses of which he was convicted were allied offenses of similar import, that his trial counsel failed to object to the amount of restitution requested by the State, and that his trial counsel failed to review the allegations in the indictment.

{¶28} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland*, 466 U.S. at 687. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not

generally constitute ineffective assistance. *State v. Carter*, 72 Ohio St.3d 545, 558 (1995). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St. 3d 136, 141-42 (1989), quoting *State v. Lytle*, 48 Ohio St.2d 391, 396 (1976).

**{¶29}** First, Shanklin argues that his trial counsel's performance was deficient because his trial counsel failed to raise with the trial court that the offenses of which he was convicted were allied offenses of similar import. The failure to make a motion is not per se ineffective assistance of counsel. *State v. Schlosser*, 3d Dist. Union No. 14-10-30, 2011-Ohio-4183, ¶ 34, citing *In re Smith*, 3d Dist. Hancock No. 5-01-34, 2002 WL 255126, *6 (Feb. 22, 2002). "Without proving that trial counsel was deficient for failing to make certain motions and that those motions had a reasonable probability of success, the ineffective assistance of counsel claim fails." *Id.* As we determined in Shanklin's first assignment of error, the offenses of which Shanklin was convicted were not allied offenses of similar import and, thus, not subject to merger. Accordingly, Shanklin's argument here is without merit—that is, Shanklin cannot show that had his trial counsel raised the issue of merger with the trial court, his trial counsel's motion would have had a reasonable probability of success.

**{¶30}** Next, Shanklin argues that his trial counsel was ineffective because he failed to object to the amount of restitution requested by the State and ordered

by the trial court. As we determined in Shanklin's second assignment of error, the trial court properly imposed $136,626.09 in restitution under R.C. 2929.18(A)(1). On appeal, Shanklin has not argued that there was any additional information that would have altered the final restitution order. Indeed, because the trial court ordered an amount of restitution that was less than the economic loss DCFS asserted in its victim-impact statement, it is unlikely that Shanklin would have prevailed even if his trial counsel challenged the restitution requested by the State and ordered by the trial court. Having no argument that would have changed the outcome here, we are not persuaded that trial counsel was ineffective for failing to object to the restitution requested by the State and ordered by the trial court. *See State v. Tate*, 2d Dist. Montgomery No. 25386, 2013-Ohio-5167, ¶ 88 (concluding that the defendant was not prejudiced by his trial counsel's failure to object to the restitution order because the restitution was properly imposed under R.C. 2929.18(A)(1) and the defendant did not provide any evidence that would have changed the final restitution order).

{¶31} Third, Shanklin argues that his trial counsel was ineffective because he failed to review the allegations in the indictment. Specifically, Shanklin asserts that his trial counsel should have reviewed whether Count One of the indictment should have been based on the contract amount or the actual value of the vehicles. However, we decline to address Shanklin's assertion because he did not provide

any argument relative to how he was prejudiced or how his trial counsel was deficient for failing to review the charges in the indictment. *State v. Raber*, 189 Ohio App.3d 396, 2010-Ohio-4066, ¶ 30 (9th Dist.) ("[I]f an argument exists that can support [an] assignment of error, it is not this [c]ourt's duty to root it out."). *See also* App.R. 12(A)(2); App.R. 16(A)(7).

{¶32} Accordingly, Shanklin's third assignment of error is overruled.

### Assignment of Error No. IV

**The trial court erred when it imposed consecutive sentences.**

{¶33} In his fourth assignment of error, Shanklin argues that the trial court erred in sentencing him to consecutive sentences. Specifically, Shanklin argues that the trial court did not make the proper findings required by R.C. 2929.14(C)(4) and that it was improper for the trial court to impose consecutive sentences because of the change in the law.

{¶34} Shanklin concedes that he did not object to the imposition of consecutive sentences at the sentencing hearing. Consequently, Shanklin's failure to object to the imposition of his consecutive sentences waives all but plain error on review. *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 152. As we noted above, plain errors are obvious defects in the proceedings that affect substantial rights, and include the imposition of a sentence not authorized by statute. *Stewart*, 2008-Ohio-5823, at ¶ 7.

{¶35} R.C. 2929.14(C)(4) requires a trial court to make specific findings on the record before imposing consecutive sentences. *State v. Hites*, 3d Dist. Hardin No. 6-11-07, 2012-Ohio-1892, ¶ 11; *State v. Peddicord*, 3d Dist. Henry No. 7-12-24, 2013-Ohio-3398, ¶ 33. Specifically, the trial court must find: (1) consecutive sentences are necessary to either protect the public or punish the offender; (2) the sentences would not be disproportionate to the offense committed; and (3) one of the factors in R.C. 2929.14(C)(4)(a), (b), or (c) applies. *Id.*; *Id.*

{¶36} Here, before imposing consecutive sentences, the trial court found that consecutive sentences were necessary to protect the public and punish Shanklin and that the sentences were not disproportionate to the seriousness of Shanklin's conduct. (Nov. 7, 2013 Tr. at 11). Further, the trial court found that two or more of the multiple offenses Shanklin committed were so great or unusual that no single prison term for any of the offenses committed as part of any courses of conduct adequately reflected the seriousness of his conduct and that Shanklin's history of criminal conduct—in particular, his absconsion from the jurisdiction of the court during the pendency of the case—demonstrated that consecutive sentences are necessary to protect the public from future crime. (*Id.*).

{¶37} The trial court incorporated these findings into its judgment entry of sentence. (Nov. 7, 2013 JE, Doc. No. 225). Therefore, because the trial court made the requisite findings before imposing consecutive sentences and

-24-

incorporated its findings into its sentencing entry, it was not plain error for the trial court to impose consecutive sentences.

**{¶38}** For these reasons, Shanklin's fourth assignment of error is overruled.

**{¶39}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ROGERS and SHAW, J.J., concur.**

**/jlr**